611

Argued and submitted September 21, reversed and remanded with instructions
December 2, 1992

In the Matter of
Kyle Alexander Nelson, a Child.
STATE ex rel JUVENILE DEPARTMENT
OF LANE COUNTY
and Children's Services Division,
*Appellants,*

*v.*

Kelly NELSON,
David Nelson and Kyle Alexander Nelson,
*Respondents.*

(91-415; CA A73107)

842 P2d 447

Michael C. Livingston, Assistant Attorney General, Salem, argued the cause for appellants. With him on the brief were Charles S. Crookham, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

George W. Kelly, Eugene, argued the cause for respondent Kelly Nelson.

No appearance for respondents David Nelson and Kyle Alexander Nelson.

612

Before Joseph, Chief Judge, and Deits and Durham, Judges.

DEITS, J.

**DEITS, J.**

The state appeals from a juvenile court order dismissing the state's petition to find that child is within its jurisdiction. The parties are the child Kyle and his parents. On *de novo* review, we reverse.

Child, who was 2 years old at the time of the hearing, lives with his mother and her boyfriend, Chetwood. On September 10, 1991, both child's grandmother and his father noticed that child had red marks on his face. Father described the marks as "like three stripes * * * approximately three and a half inches long." When asked about the marks by grandmother and father, mother said that child had hit himself or had been hit with a toy by another child. Later that same day, mother, child and Chetwood went to the laundromat. Mother went into the laundromat, leaving child and Chetwood in the cab of a pickup truck. According to a witness, Chetwood came into the laundromat a few minutes later acting agitated. Mother and Chetwood returned to the truck and, according to the witness, Chetwood continued to act agitated.

When she returned, mother found child in the back of the truck. She saw that child had injuries that he had not had when she had gone into the laundromat. He had a bump on the back of his head and one on the front, just beneath his hairline. He also was bleeding from behind the ear. He was crying and was very upset, calling for his mother. Mother testified that Chetwood told her that the child had become upset while they were together in the truck and that child had hit his head on the glove box while trying to get away from him. He told her that he had then put child in the back of the truck where he had hit his head again while thrashing around.

When they returned home, child continued to be upset and was in pain. Mother noticed that he also had bruises on his shoulders. Grandmother testified that mother called her that night and asked her to come get her, because "[Chetwood] would prefer that she not be there that night." Grandmother said that mother later called back and told her not to come. Grandmother went anyway. She noted that child was not energetic, had blood on his forehead and was having pain in the back of his head. She testified that she overheard

mother and Chetwood say "that if they took [child] to a doctor that probably no one would believe that he had done that to himself." Grandmother testified that she thought that she suggested that they take child to a doctor. She called mother later that evening and expressed concern about the child's head injuries.

Grandmother returned to mother's house at 7:15 the next morning and watched child that day for mother and kept him overnight. The next morning, she noticed swelling of child's injuries and noticed the shoulder injuries for the first time. After calling mother, she took him to his pediatrician, Dr. Dunphy, who examined child and found numerous injuries: bruises on the left side of his face, a bruise on his right cheek, bruises on his left ear and left forehead, an injury to his nasal bridge, bruising under both eyes, an injury to his right ear, wounds on his scalp and bruises on both shoulders. Dunphy testified that all of the injuries were of approximately the same age.

Dunphy was told of mother's and Chetwood's explanation of how the injuries had occurred in the truck and of child's tendency to throw tantrums in which he hurts himself. He was also told of the possibility that another child had hit child. However, Dunphy concluded that it was highly unlikely that the injuries were self-inflicted or were caused by another child, and for that reason he reported the situation to CSD. He testified:

> "I think any of his injuries, if taken by themselves, could have happened accidently with a falling motion or something along those lines. I *think if you take all of the injuries together noting that there were injuries in multiple places, I can say with reasonable medical certainty that they did not happen in a self-inflicted way*. I have to say that I think any of these injuries by themselves are fairly common things to see as isolated injuries.
>
> "\* \* \* \* \*
>
> "I think that taken together, all of those injuries are — it's reasonably certain to say that they didn't happen by him thrashing about.
>
> "\* \* \* \* \*
>
> "[I t]hink it's the injuries in toto that make the story as explained to me inconsistent and unable for me to believe

that they happened accidentally or as the story says."
(Emphasis supplied.)

After Dunphy examined child, Detective Reese talked to child and mother. He described child's injuries to mother and told her of Dunphy's opinion that the injuries were not self-inflicted. Mother was quite defensive and continued to assert that the injuries were self-inflicted or that he had been hurt by another child.

On September 13, 1991, the state filed a petition seeking to have the juvenile court assume jurisdiction over child. An amended petition was filed on October 17, 1991. The amended petition alleged that child was within the court's jurisdiction because:

"The conditions and circumstances of [the child] are such as to endanger his own welfare, in that:

"A. The child's mother and/or mother's live-in companion, Cole Ch[e]twood, subjected the child to unexplained injuries, to wit: bruising and swelling to the head and shoulders. The mother's explanation of the injuries is in variance with the doctor's explanation of how the injuries occurred.

"B. The child's mother failed to provide for the child's physical well-being, in that: the child was injured on or about Tuesday, September 10, 1991, and the mother did not seek medical attention for the child by Thursday, September 12, 1991."

The relevant statutory provisions are ORS 419.476 (1)(c) and (e):

"(1) The juvenile court has exclusive jurisdiction in any case involving a person who is under 18 years of age and:

"* * * * *

"(c) Whose behavior, condition or circumstances are such as to endanger the welfare of the person or the welfare of others;

"* * * * *

"(e) Either the person's parents or any other person having custody of the person have abandoned the person, failed to provide the person with the support or education required by law, subjected the person to cruelty or depravity or to unexplained physical injury or failed to provide the person with the care, guidance and protection necessary for the physical, mental or emotional wellbeing of the person[.]"

The trial court found that child's injuries were caused by Chetwood and that mother continues to believe his story that the injuries were self-inflicted. However, the court concluded that it could not assume jurisdiction under either subsection (c) or (e). The court explained that, although Chetwood was taking care of child at the time of the injuries, he was not a parent of the child or his "custodian" within the meaning of subsection (e). He also concluded that the child's circumstances were not such as to endanger his welfare and that, therefore, subsection (c) could not be the basis of assuming jurisdiction.

The state argues that the trial court erred in its interpretation of "custodian" in ORS 419.476(1)(e) in that Chetwood could come within the meaning of "custodian" as child's caretaker and, alternatively, that, under subsection (c), the evidence established that the child's circumstances were such as to endanger his welfare. We conclude, on *de novo* review, that jurisdiction was established under subsection (c). Because that holding alone provides a basis for the juvenile court to assume jurisdiction, it is unnecessary to address the state's argument concerning the proper interpretation of subsection (e).

As the trial court found, the evidence establishes that child was subjected to physical abuse by mother's live-in boyfriend. After the injuries occurred, despite the facts that some of the injuries were apparent and that child was in obvious discomfort and despite grandmother's expressions of concern, mother did not take him to the doctor. She gave as one of the reasons that "no one would believe that he had done that to himself." After grandmother took him to the doctor, mother was told that it was the doctor's opinion that the injuries were not self-inflicted. However, mother continued to accept her boyfriend's explanation of the injuries and apparently continued to believe that they were self-inflicted.

On *de novo* review, we conclude that the state proved, by a preponderance of the evidence, circumstances that endanger child's welfare. ORS 419.500(1); *see State ex rel Juv. Dept. v. Gardner*, 95 Or App 540, 770 P2d 79 (1989). The juvenile court should have assumed jurisdiction of child under ORS 419.476(1)(c).

Reversed and remanded with instructions to enter order finding child to be within the jurisdiction of the juvenile court.